**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BM REAL ESTATE SERVICES, INC., | NO. CV 20-3974-KS |
| Plaintiff, | MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS |
| v. | |
| ANGEL OAK MORTGAGE SOLUTIONS LLC, et al., | |
| Defendants. | |

**INTRODUCTION**

On April 30, 2020, BM Real Estate Services, Inc. dba Priority Financial Network ("Plaintiff"), a mortgage banker, filed a complaint asserting breach of contract and related claims against mortgage loan purchaser Angel Oak Mortgage Solutions LLC ("Defendant"). (Dkt. No. 1 (the "Complaint").)  On June 26, 2020, the parties consented to have this matter proceed before United States Magistrate Judge Karen L. Stevenson for all further proceedings. (Dkt. No. 11, 14-15.)  On July 10, 2020, Defendant filed a Motion to Dismiss for failure to state a claim (the "Motion").  (Dkt. No. 17.)  On August 12, 2020, Plaintiff filed an Opposition to the Motion (the "Opposition").  (Dkt. No. 20.)  On August 19, 2020, Defendant filed a

1

1   Reply.  (Dkt. No. 22.)  On August 20, 2020, the Court vacated hearing on the Motion, deemed
2   the matter suitable for decision without oral argument, and took the Motion under submission
3   for decision.  (Dkt. No. 24.)

5                                      **THE COMPLAINT**

7         Plaintiff partners with larger financial institutions that purchase loans that it originates.
8   (Complaint ¶ 1.)  The Complaint alleges that Defendant is one of those partners and, pursuant
9   to a Mortgage Loan Purchase and Sale Agreement (the "MLPA"), it agreed to purchase certain
10  home mortgages that Plaintiff originated.  (*Id.*)  The steps necessary to close the purchase of
11  mortgages from Plaintiff are detailed in Defendant's Seller Guide; Plaintiff alleges that, in
12  each and every transaction, Defendant took the same steps to close its purchase of mortgages
13  from Plaintiff, "including sending a Conditional Loan Approval (which listed the exclusive
14  conditions to closing) and then Clearing Conditions."  (*Id.*)  Plaintiff alleges that at the outset
15  of the COVID-19 pandemic in early 2020, despite repeatedly reaffirming its commitment to
16  purchase mortgage loans, Defendant failed to honor its obligations to Plaintiff even as to loans
17  for which Defendant already had Cleared Conditions and which Plaintiff already had funded
18  by early March 2020.  (*Id.* at ¶ 2.)

20        The Complaint contains the following factual allegations.  The parties entered into the
21  MLPA on May 30, 2019.  (*Id.* at ¶ 9.)  MLPA § 6.01 ("Closing") provides, in relevant part:

23              Each closing shall be subject to each of the following conditions:

25              (a) No breach or default exists under this Agreement;
26              (b) The Purchaser and the Seller shall have received, or the Purchaser's and
27        the Seller's attorneys shall have received in escrow, all Closing Documents, duly
28        executed[;]

                                                  2

(c) the Seller shall not have experienced any Material Adverse Change . . .; and

(d) All other terms and conditions of this Agreement shall have been complied with.

Subject to the foregoing conditions, the Purchaser shall pay to the Seller on the applicable Closing Date, the Purchase Price for the Mortgage Loans in the related Mortgage Loan Package pursuant to Section 3.01 of this Agreement, and the Seller shall deliver the Mortgage Loans to the Purchaser."

(*Id.* at ¶ 10; *see also* Declaration of Tom Hutchens ("Hutchens Decl."), Ex. A at 30.)

Defendant also issued Plaintiff its Seller Guide, which lists the procedures for Plaintiff to sell mortgage loans to Defendant. (Complaint at ¶ 11.) Section 9 of the Seller Guide ("Non-Delegated Correspondent Lending") describes the parties' relationship as to the five mortgage loans at issue in this action from underwriting through Plaintiff's funding of the loan and resubmission for Purchase Review. (*Id.*) In addition, under section 5 of the Seller Guide ("Loan Funding"), once the Mortgage File has been submitted for Purchase Review, Defendant commits to schedule a Purchase Review, and, if it does not find discrepancies, then it commits to funding the purchase. (*Id.*)

Over the first nine months of the MLPA term, Defendant purchased several mortgages from Plaintiff, valued at over $26 million; in doing so, the parties established a course of dealing consistent with the MLPA and Seller Guide. (*Id.* at ¶ 12.) Based on that course of dealing and as stipulated in the MLPA and Seller Guide, Defendant required Plaintiff to engage in and complete an underwriting process prior to funding a loan; under that process, once a loan "Cleared Conditions" (*i.e.*, Defendant issued a Conditional Approval form that did not include any items under the section entitled "Client to Provide") and Plaintiff lent the funds to

its customer, Defendant purchased all such loans from Plaintiff at the agreed price.  (*Id.* at ¶ 13.)  This included cases when prevailing market interest rates increased materially between the time the interest rate locked and closing; thus, Plaintiff assumed the risk of deteriorating economic circumstances.  (*Id.*)

As to the loans at issue here, Plaintiff performed its contractual obligations by following the procedures outlined in section 9 of the Seller Guide; it then submitted the mortgage files to Defendant for purchase review.  (*Id.* at ¶ 14.)  Defendant was then required to schedule a purchase review.  (*Id.* at ¶ 15.)  Defendant never identified any material differences found from the underwriting approval and the closed loan submission; thus, the next step, pursuant to the Seller Guide, was for Plaintiff to receive an email notification to include the Funding Schedule/Purchase Advice for execution.  (*Id.*)  Then, "[u]pon receipt of the executed Purchase Advice, [Defendant] will wire funds to [Plaintiff.]"  (*Id.* (citing Seller Guide § 5.3).)  Defendant had no discretion to reject the five loans that Plaintiff submitted for purchase because Plaintiff completed the entire prescribed process.  (*Id.*)

In March 2020, after the COVID-19 pandemic impacted mortgage markets, Defendant abruptly refused to purchase the five loans that Plaintiff had funded (after receiving Conditional Approval forms with no items in the "Client to Provide" section).  (*Id.* at ¶ 16.)  As to each loan, Defendant's representative informed Plaintiff that the loan had cleared conditions prior to closing, Plaintiff submitted the loan for purchase review, but Defendant thereafter failed to perform its obligations.  (*Id.* at ¶ 17.)

In late March 2020, Plaintiff's affiliate wrote to Defendant's representatives to respond to Defendant's message that it had stopped funding loans.  The agent requested: "please advise us on where we are regarding those loans previously CTC [clear to close], funded and delivered to your group.  We have other investors still honoring locked, funded and delivered loans.  Your group had previously committed to honor all locks with CTC'ed and funded on our

4

warehouse line." (*Id.* at ¶ 18.)  Defendant's representative replied, "Confirmed.  They are not doing any non [Qualified Mortgages]." (*Id.*)  Defendant's representative did not deny that his team had given assurances that Defendant would purchase locked, funded, and delivered loans. (*Id.*)  Plaintiff's CEO then responded, "Thank you for confirming that.  I really want to know if you intend to purchase the loans on our warehouse line.  We are willing to work with you but at this point we have no guidance or communication about your intentions.  Right now we have 5 loans totaling $8,238,000 that are sitting on our warehouse line.  All of these loans were given a clear to close prior to us funding." (*Id.*)  Defendant's representative did not deny the allegation that the loans were "given a clear to close" or that his group had "committed to honor all locks with CTC'd and funded." (*Id.*)  Instead, he referred only to changed circumstances that supposedly excused Defendant's failure to perform, stating, "If I can survive this week I will do my best to work with you.  As you know, the market has collapsed virtually overnight." (*Id.*)  Plaintiff alleges that this correspondence confirms that Defendant had broken its promises and breached the MLPA. (*Id.*)

Based on the MLPA, industry norms, and the parties' course of dealing, Defendant's representations that the loans at issue "Cleared Conditions" signified that Defendant would purchase each of the five loans at the agreed upon price upon Plaintiff's funding each loan and upon receipt of the appropriate executed paperwork. (*Id.* at ¶ 19.)  Defendant had no discretion to reject the loans because Plaintiff delivered funded loans on a non-delegated basis, and Defendant therefore had the sole discretion to approve or reject the credit risk prior to Plaintiff funding the loan. (*Id.*)  Mortgage lenders like Plaintiff choose non-delegated lenders and incur the collateral consequences of that choice to eliminate loan sale risk; Defendant improperly treated the parties' relationship as one involving a delegated lender. (*Id.*)  Despite the foregoing contractual obligations and material representations, Defendant failed to purchase the loans that Plaintiff originated, Defendant had cleared to close, and Plaintiff had funded. (*Id.* at ¶ 20.)  On March 23, 2020, due to circumstances caused by the pandemic, Defendant informed Plaintiff of its decision, which was weeks after Defendant completed Clearing

Conditions and Plaintiff funded the loans.  (*Id.* at ¶ 21.)  Defendant did not represent that the mortgage file for any of the loans at issue was defective. (*Id.* at ¶ 22.)

Defendant cited MLPA § 2.01 ("Loan Sale") to support its refusal to purchase loans; that section provides, in part:  "The Seller agrees to sell and the Purchaser agrees to purchase on each Closing Date pursuant to this Agreement the Mortgage Loan(s) being sold by Seller as listed on each Assignment and Conveyance Agreement [("ACA")]."[1]  (*Id.* at ¶ 23; *see also* Hutchens Decl., Ex. A at 9.)  According to Plaintiff, the ACA is not discussed in Defendant's Seller Guide, signifying that its issuance is not a required step in the process.  (Complaint ¶ 24.)  Defendant's excuse also misconstrues the MLPA by suggesting that Defendant could not incur liability for failure to purchase a loan merely because the loan was not listed on the ACA; importantly, MLPA § 6.01, which lists the closing conditions, does not list delivery of an ACA as a necessary condition for closing.  (*Id.* at ¶ 25.)  It merely states that the Closing shall take place on the Closing Date listed in the ACA; so, the ACA is a mere formality and boilerplate document that Defendant prepares to incorporate information from the mortgage file and the agreed upon price, not a document essential to the existence of an agreement by Defendant to purchase a loan.  (*Id.*)  The ACA must be issued after the loan funds only because it sets the exact purchase price with per diem interest, which is not known until the loan has funded, not because it reflects new developments or negotiations from underwriting.  (*Id.*)

Despite the foregoing process, Defendant now contends that it has no obligation to purchase the loans at issue because *it* chose not to issue an ACA for any of those loans.  (*Id.* at ¶ 26.)  Based on that interpretation, Plaintiff contends that Defendant could avoid purchasing a mortgage that it underwrote and agreed to purchase at an agreed price because Defendant unilaterally chose not to issue certain paperwork for Plaintiff to execute.  (*Id.*)  The MLPA

---

[1]     The MLPA defines an ACA as follows: "With respect to each Mortgage Loan Package and each Closing Date, an assignment and conveyance of the Mortgage Loan purchase on the related Closing Date in the form annexed [to the MLPA] as Exhibit B."  (*See* Hutchens Decl., Ex. A at 3; *see also id.* at 40-42.)

1    does not give Defendant the discretion to accept or reject a loan once Defendant completes

2    Clearing Conditions and Plaintiff provides the required loan documentation to the Borrower.

3    (*Id.* at ¶ 27.)  Further, as to the loans here, Defendant cleared conditions for closing, Plaintiff

4    funded loans in reliance thereon, and Plaintiff provided the required documentation to

5    Defendant.  (*Id.*)  Plaintiff tapped its warehouse line of credit to fund the loans at issue, which

6    required Plaintiff to repay the borrowed amounts within 45 days.  (*Id.* at ¶ 28.)  To satisfy its

7    commitment to the lender, and because of Defendant's refusal to purchase the loans here,

8    Plaintiff alleges that it will likely be forced to sell these mortgages at prevailing market rates,

9    which will entail a substantial discount to the purchase price set forth in the Lock Commitment.

10   (*Id.*)  Additionally, because of Defendant's conduct, Plaintiff believes that it will suffer harm

11   to its credit and reputation; these damages were foreseeable, are traced solely to Defendant's

12   breach of contract, and are independent of any collateral enterprise.  (*Id.* at ¶ 29.)

13

14       The Complaint asserts five causes of action:  (1) breach of contract ("Claim One"); (2)

15   promissory estoppel ("Claim Two"); (3) breach of implied covenant of good faith and fair

16   dealing ("Claim Three"); (4) intentional misrepresentation ("Claim Four"); (5) and negligent

17   misrepresentation ("Claim Five").  (*Id.* at ¶¶ 30-66.)  Plaintiff seeks compensatory damages of

18   $8,440,960 less any amounts recoverable through efforts to mitigate damages, consequential

19   damages, punitive damages, costs of suit, prejudgment interest, and attorney's fees.

20

21                                    **THE MOTION**

22

23       Defendant argues that the MLPA designates Georgia law as governing all claims in the

24   case.  (Motion at 8-9.)  It then argues that the Complaint should be dismissed for the following

25   reasons.  Claim One should be dismissed because Defendant has no obligation to purchase a

26   loan originated by a correspondent lender until Defendant executes an ACA, and Plaintiff fails

27   to identify any express contractual provision that Defendant has breached.  (*Id.* at 9-12.)  Claim

28   Two should be dismissed because it is duplicative of Claim One, Plaintiff does not dispute the

validity of the MLPA, Plaintiff identifies no broken promise, any alleged promise is too vague and indefinite to be enforced, and the contract disclosures preclude a finding of reliance as a matter of law. (*Id.* at 14-18.)  Claim Three should be dismissed because it is duplicative of Claim One and does not provide an independent basis for liability. (*Id.* at 12-14.)  Claims Four and Five should be dismissed because they are duplicative of Claim One, they are barred by the economic loss rule, Plaintiff fails to plead the alleged fraud with particularity, and the contract disclosures preclude a finding of reliance as a matter of law. (*Id.* at 18-23.)  Finally, Defendant argues that the Court should dismiss the request for punitive damages because Plaintiff fails to plead a plausible intentional misrepresentation claim, the remaining claims cannot support punitive damages as a matter of law, and Plaintiff alleges no facts entitling it to punitive damages. (*Id.* at 23-25.)

In the Opposition, Plaintiff concedes that Georgia law applies to the contract claims (Claims One, Two, and Three). (Opposition at 7.)  As to those claims, Plaintiff first argues that Defendant misconstrues the MLPA by arguing that it has the discretion to reject any mortgage that Plaintiff offers until Defendant issues an ACA; the MLPA actually provides that Defendant has no such discretion. (*Id.* at 7-9.)  Second, Plaintiff's interpretation of the MLPA and Seller Guide is supported by the parties' custom, practice, and course of dealing. (*Id.* at 9-10.)  Third, because Plaintiff has sufficiently pleaded a breach of contract claim (Claim One), Claims Two and Three (which Plaintiff concedes may only survive in Claim One survives) are likewise viable claims. (*Id.* at 10-11.)  As to the intentional misrepresentation claim (Claim Four), Plaintiff argues that California law applies, the economic loss rule does not apply where Plaintiff was fraudulently induced to enter the contract, the fraud allegations are sufficiently specific to survive dismissal and meet the reliance requirement, and the allegations support the prayer for punitive damages. (*Id.* at 12-18.)  Finally, Plaintiff voluntarily dismisses Claim Five in light of the fact that the available relief is duplicative of that available in contract. (*Id.* at 19.)

//

8

1    In its Reply, Defendant reiterates its arguments that the Court should dismiss Claim One

2    because Plaintiff identifies no contractual provision that Defendant has breached.  (Reply at 3-

3    9.)  Second, Claim Two is not viable independent of Claim One.  (*Id.* at 10-11.)  Third, Claim

4    Three is not viable without the Claim One and Claim Three contradicts the express terms of

5    the MLPA.  (*Id.* at 9-10.)  Fourth, California law does not apply to Claim Four; no matter

6    which state's law applies, the economic loss rule bars the claim, which is duplicative of

7    Plaintiff's contract claim; the economic loss rule applies because the Complaint does not assert

8    fraudulent inducement, but rather, that forms issued by Defendant nearly a year after the

9    contract's execution were somehow fraudulent; and there was no reliance in this case.  (*Id.* at

10   11-13.)  Finally, Defendant argues that the Court should dismiss the conclusory request for

11   punitive damages and should deny leave to amend the Complaint as futile.  (*Id.* at 13-14.)

13   **THE APPLICABLE LEGAL STANDARDS**

15   A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal

16   sufficiency of the claims in the Complaint.  The issue on a Rule 12(b)(6) motion is not whether

17   Plaintiff will ultimately prevail, but whether Plaintiff may offer evidence to support the claims

18   asserted.  *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).  Rule 12(b)(6) is

19   read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim

20   showing that the pleader is entitled to relief.  FED. R. CIV. P. 8(a)(2).  When evaluating a Rule

21   12(b)(6) motion, the Court must accept all material allegations in the complaint as true and

22   construe them in the light most favorable to the non-moving party.  *Moyo v. Gomez*, 32 F.3d

23   1382, 1384 (9th Cir. 1994).  The Court may also consider "documents whose contents are

24   alleged in a complaint and whose authenticity no party questions, but which are not physically

25   attached to the pleading."  *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled in*

26   *part on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

27   However, "the tenet that a court must accept as true all of the allegations contained in a

28   complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009);

1    *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (stating that while a complaint

2    attacked by a Rule 12(b)(6) motion need not detail factual allegations, courts "are not bound

3    to accept as true a legal conclusion couched as a factual allegation" (citations and quotations

4    omitted)).  Dismissal for failure to state a claim is not proper where a plaintiff has alleged

5    "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

6

7                                          **DISCUSSION**

8

9    **I.      Claim One (Breach of Contract)**

10

11          The parties do not dispute that pursuant to MLPA § 10.02, Georgia law governs the

12    contract claims in this dispute (Claims One, Two, and Three).  (*See* Hutchens Decl., Ex. A at

13    30.)  "The elements for a breach of contract claim in Georgia are (1) breach and the (2) resultant

14    damages (3) to the party who has the right to complain about the contract being broken." *Bates*

15    *v. JPMorgan Chase Bank, N.A.*, 768 F.3d 1126, 1130 (11th Cir. 2014) (citing *Norton v. Budget*

16    *Rent A Car Sys., Inc.*, 307 Ga. App. 501 (2010)).  To survive a motion to dismiss, a party

17    asserting breach of contract must point to an express contractual provision that an adverse

18    party has breached. *See Adkins v. Cagle Foods JV, LLC*, 411 F.3d 1320, 1327 (11th Cir. 2005).

19

20          The parties' briefing reflects that they diverge in their understanding of their relative

21    obligations under the MLPA—specifically, whether an ACA must be completed as a condition

22    precedent to closing.  Defendant argues that dismissal is warranted because the MLPA requires

23    the execution of an ACA prior to closing a loan sale.  Conversely, Plaintiff posits that all of

24    the closing conditions are contained in MLPA § 6.01 and it complied with all those conditions

25    as to the loans at issue here; it argues that Defendant's execution of an ACA is a mere formality

26    and not an essential condition for closing.  But the Court need not determine whose reading of

27    the MLPA is correct at this time because Defendant has filed a motion to dismiss pursuant to

28    Rule 12(b)(6).  It is not the proper role of the Court to evaluate the merits of Plaintiff's claim

                                                  10

1    at this stage of the litigation. *See Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 947-48 (9th

2    Cir. 2020).  The Court's role at this juncture is simply to determine whether the claims asserted

3    are sufficiently pled.  Accordingly, if Plaintiff plausibly alleges facts showing that Defendant

4    breached the express terms of the MLPA, that damages resulted from the breach, and that it

5    had the right to complain about the breach, Claim One must survive.

6

7        In Claim One, Plaintiff alleges as follows.  Under MLPA § 6.01, Defendant was

8    obligated to pay Plaintiff the Purchase Price for each mortgage loan upon satisfaction of the

9    Closing Conditions.  (Complaint ¶ 31.)  Plaintiff performed its obligations under the MLPA to

10   the extent applicable to the loans at issue in this case; it also completed the steps set forth in

11   the Seller Guide to trigger a Purchase Review, and, ultimately, to require Defendant's purchase

12   of the five loans at issue.  (*Id.* at ¶ 32.)  Each closing condition set forth in § 6.01 occurred as

13   to each loan at issue.  (*Id.* at ¶ 33.)  Moreover, during the time the MLPA had been in effect,

14   Defendant had purchased numerous Plaintiff-originated mortgages, valuing over $26 million;

15   in each previous transaction, Defendant took the same steps leading to the closing.  (*Id.* at

16   ¶ 34.)  The parties' course of conduct and relevant industry norms confirmed Defendant's

17   contractual obligation to purchase loans that Plaintiff funded after receiving a Conditional

18   Approval form that did not include any items under the "Client to Provide" section, assuming

19   Plaintiff closed the loan and submitted final documentation thereof without discrepancies; all

20   of those events occurred here.  (*Id.*)

21

22       Plaintiff asserts that Defendant breached § 6.01 by failing to purchase the five loans at

23   issue.  (*Id.* at ¶ 35.)  It alleges that as a result of the Defendant's breaches, it suffered damages

24   in the amount of $8,440,960 (the agreed-upon purchase price for the five home mortgages at

25   issue), less any amounts Plaintiff was able to recover through its efforts to mitigate damages

26   by selling mortgages at prevailing market rates.  (*Id.* at ¶ 36.)  In addition, as a result of the

27   breaches, Plaintiff will suffer harm to its credit and reputation; such damages were foreseeable;

28   they are traced solely to the breach of contract and/or are capable of exact computation; and

1  they are independent of any collateral enterprise entered into in contemplation of the contract.

2  (*Id.* at ¶ 37.)

3

4  Assuming, as it must, that Plaintiff's allegations are true and drawing all reasonable

5  inferences in its favor, the Court concludes that Claim One asserts a plausible breach of claim

6  and dismissal is not warranted at this juncture.  The first element of a Georgia breach of

7  contract claim (breach) is sufficient pled.  The MLPA specifically outlines in § 6.01 the

8  conditions necessary to close a loan sale; those conditions do not include Defendant's issuance

9  of an ACA; and Plaintiff complied with each of the conditions listed in that section.  Yet,

10  despite those circumstances, Defendant failed to purchase the loans at issue.  The second

11  element (damages) is also sufficiently pled, because Plaintiff states that it suffered $8,440,960

12  in damages that directly and proximately resulted from Defendant's alleged breach.

13  (Complaint ¶¶ 36-37.)  Finally, it is undisputed that the MLPA constitutes a valid and

14  enforceable contract between the parties and that Plaintiff had the right to complain about any

15  breach of that contract; thus, the third element of a Georgia breach of contract claim has also

16  been sufficiently pled.

17

18  Contrary to Defendant's contention, Plaintiff identifies a contractual provision that

19  Plaintiff has breached.  *See Adkins*, 411 F.3d at 1327.  Plaintiff specifically alleges that

20  Defendant breached MLPA § 6.01 by failing to close the loan sale despite Plaintiff's

21  performance of the conditions listed in that section.  (Complaint ¶ 31.)  Even if Defendant

22  disagrees with the Plaintiff's interpretation of the parties' obligations under § 6.01, at this

23  stage, Plaintiff need only identify express contractual provision that Defendant has breached.

24  *Adkins*, 411 F.3d at 1327.  Plaintiff has done so.  Consequently, Defendant's Motion is

25  DENIED as to Claim One.

26  //

27  //

28  //

1

2

## II.      Claim Two (Promissory Estoppel)

3

        Georgia law recognizes the doctrine of promissory estoppel in statute.  *See* GA. CODE

ANN. § 13-4-44.  Under Georgia law, promissory estoppel may be used to allow enforcement

of promises that would fail under traditional rules of contract law.  *See, e.g.*, *Sun-Pac. Enters.,*

*Inc. v. Girardot*, 251 Ga. App. 101 105-06 (2001) (citing *20/20 Vision Ctr., Inc. v. Hudgens*,

256 Ga. 129 (1986)).  To state a promissory estoppel claim, Plaintiff must establish that "[1]

the defendant made a promise [2] upon which [it] reasonably should have expected the

plaintiff to rely, [3] the plaintiff relied on the promise to [its] detriment, and [4] injustice can

be avoided only be enforcing the promise because the plaintiff forwent a valuable right."

*Thompson v. Floyd*, 310 Ga. App. 674, 682 (2011) (citation omitted).  "Promissory estoppel

does not apply to a promise that is vague, indefinite, or of uncertain duration."  *Mariner*

*Healthcare, Inc. v. Foster*, 280 Ga. App. 406, 412 (2006).   A promise enforceable by

promissory estoppel "need not meet the formal requirements of a contract," but "it must,

nonetheless, have been communicated with sufficient particularity to enforce the

commitment." *Mooney v. Mooney*, 245 Ga. App. 780, 783 (2000).  Promissory estoppel claims

are "extremely fact-specific" and "not susceptible to the application of generalized rules."

*Doll v. Grand Union Co.*, 925 F.2d 1363, 1372 (11th Cir. 1991).

19

20

        As to Claim Two, the Complaint makes the following allegations. Under the MLPA,

Defendant issued a Conditional Approval to Plaintiff as to each loan at issue, and no form had

any items under the "Client to Provide" section.  (Complaint ¶ 39.)  According to industry

norms and the parties' course of dealing, that Conditional Approval clearly meant that

Defendant was committing to purchase the associated home mortgages once Plaintiff closed

the loans and submitted the associated paperwork.  (*Id.*)  Plaintiff foreseeably, reasonably, and

detrimentally relied on Defendant's false representations (*i.e.*, the representations contained in

the Conditional Approvals for each of the loans that no "Client to Provide" conditions

remained and the representations in the Seller Guide that Plaintiff therefore would purchase

the mortgages by funding the five loans at issue, subject to Plaintiff submitting the required paperwork without any discrepancies). (*Id.* at ¶ 40.)

The Complaint implies that by issuing Plaintiff the Conditional Approval forms for each loan at issue, Defendant represented that it promised to purchase the associated home mortgages following Plaintiff's fulfillment of its contractual obligations. (*See id.* at ¶¶ 39-40.) Plaintiff clarifies in the Opposition that Defendant's representation in each Conditional Approval that each mortgage was "clear-to-close" constituted a promise that Defendant would purchase the mortgage pursuant to an ACA absent any defect in the mortgage or related documents. (Opposition at 11.)  However,  even if Plaintiff sufficiently pleaded a broken promise on which it detrimentally relied, Plaintiff's promissory estoppel claim still fails because the relief it seeks is duplicative of the relief sought in Claim One.  There is no substantive difference between the broken promise alleged in Claim Two and the breach of the MLPA alleged in Claim One. (*Compare id.* & Complaint ¶¶ 39-40, to Complaint ¶ 34 (describing Defendant's contractual obligation to purchase loans that Plaintiff funded after receiving a Conditional approval form).)  Moreover, where the parties enter into a contract such as the MLPA—*i.e.*, one with bargained for consideration, the terms of which include the promises alleged in support of a promissory estoppel claim—promissory estoppel is not available as a remedy. *See Adkins*, 411 F.3d at 1326 (citing *Bank of Dade v. Reeves*, 257 Ga. 51 (1987)); *see also Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.*, 426 F. Supp. 2d 1356, 1371 (N.D. Ga. 2006) (granting motion to dismiss promissory estoppel claim because the allegations supporting the claim were "essentially identical" to those asserted in breach of contract).

Finally, Defendant correctly points out that Plaintiff has not asserted the promissory estoppel claim as an alternative or inconsistent theory of recovery. *See* FED. R. CIV. P. 8(e)(2). But even if Plaintiff had done so, the claim would still be subject to dismissal because neither side disputes that the MLPA is a valid and enforceable contract. *See Am. Casual Dining, L.P.*,

14

1    426 F. Supp. 2d at 1371 ("When neither side disputes the existence of a valid contract, the

2    doctrine of promissory estoppel does not apply, even when it is asserted in the alternative.").

3

4    Accordingly, Plaintiff has failed to sufficiently plead a promissory estoppel claim.  Thus,

5    Defendant's Motion is GRANTED as to Claim Two.

6

7    **III.    Claim Three (Breach of Implied Covenant of Good Faith and Fair Dealing)**

8

9    According to the Georgia Supreme Court, "[e]very contract imposes upon each party a

10   duty of good faith and fair dealing in its performance and enforcement." *Brack v. Brownlee*,

11   246 Ga. 818, 820 (1980).  Under Georgia law, where a party cannot maintain a cause of action

12   for breach of contract, that party cannot maintain an independent cause of action for a breach

13   of good faith because the implied covenant of good faith and fair dealing "is not an independent

14   contract term." *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1429 (11th Cir. 1990).

15

16   Here, Plaintiff alleges that Defendant violated the implied covenant of good faith and

17   fair dealing by failing to issue an ACA setting forth the previously agreed terms for the

18   purchase of the loans at issue once the MLPA's clearing conditions were complete and once

19   Plaintiff funded the loans in reliance thereon.  (Complaint ¶ 45.)  As discussed above, Plaintiff

20   has adequately set forth a breach of contract claim, and duties imposed by the MLPA also

21   serve as a sufficient basis for Plaintiff's claim that Defendant breached the implied covenant

22   of good faith and fair dealing. *TechBios, Inc. v. Champagne*, 301 Ga. App. 592, 595 (2009).

23

24   Defendant argues that Claim Three should be dismissed because it is tethered to Claim

25   One and it does not provide an independent basis for liability.  (Motion at 12-14.)  However,

26   because Claim One is not subject to dismissal at this time, Defendant's argument as to Claim

27   Three is unpersuasive.  Accordingly, Defendant's Motion is DENIED as to Claim Three.

28   //

15

1

2

## IV.    Claim Four (Intentional Misrepresentation)

3

### A.  California Law Governs Claim Four

4

5    The parties dispute whether Georgia law also applies to Claim Four, a tort claim.

6   Defendant argues that like the contract claims, Georgia law governs.  (Motion at 8-9.)  Plaintiff

7   contends that California law governs Claim Four, but even if Georgia law applies, dismissal

8   of the claim is not warranted.  (Opposition at 12-13.)  A federal court sitting in diversity applies

9   the choice of law rules of the forum state.  *Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078,

10   1082 (9th Cir. 2008).  Therefore, the Court applies California's choice of law rules.  *Hatfield*

11   *v. Halifax PLC*, 564 F.3d 1177, 1182 (9th Cir. 2009).  "If the parties state their intention in an

12   express [contractual] choice-of-law clause, California courts ordinarily will enforce the

13   parties' stated intention[.]"  *Id.* (quoting *Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal. App. 4th

14   1436, 1450 n.7 (2007)).  Courts deviate from that typical outcome only when "the analytical

15   approach articulated in § 187(2) of the Restatement (Second) of Conflict of Laws, [and

16   explained in *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992),] dictates a different

17   result."  *Id.* at 1082 (citation omitted).

18

19    Here, MLPA § 10.02 provides that the parties' relationship is to be governed by Georgia

20   law.  (*See* Hutchens Decl., Ex. A at 30.)  Under California choice-of-law principles, "the scope

21   of a choice-of-law clause in a contract is a matter that ordinarily should be determined under

22   the law designated therein."  *Washington Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906,

23   916 n.3 (2001) (citing *Nedlloyd Lines*, 3 Cal. 4th at 469 n.7).  Accordingly, because the MLPA

24   identifies Georgia law and does not specify otherwise, the Court applies Georgia law to

25   determine which of Plaintiff's claims the MLPA covers.  *See, e.g.*, *EVGA Corp. v. B. & H*

26   *Foto Elecs. Corp*, Case No. CV 19-2230-JLS, 2020 WL 5028321, at *3 (C.D. Cal. June 22,

27   2020) (addressing a similar choice-of-law question); *see also JMP Sec. LLP v. Altair*

28

16

1   *Nanotechs. Inc.*, 880 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) (similar issue and citing, *inter*

2   *alia*, *Washington Mut. Bank*, 24 Cal. 4th at 916 n.3).

3

4          Here, that is critical because Georgia and California diverge in their approaches to

5   determining the scope of a contractual choice-of-law provision.   "Under the California

6   approach, all claims 'arising from or related to' a contract are covered by the contract's choice-

7   of-law clause, regardless of whether they are characterized as contract or tort claims."  *JMP*

8   *Sec.*, 880 F. Supp. 2d at 1036 (citing *Nedlloyd*, 3 Cal. 4th at 470).  But under Georgia law, a

9   choice of law provision like the one in the MLPA applies only to contract claims, not to tort

10   claims.[2]   *See Young v. W.S. Badcock Corp.*, 222 Ga. App. 218, 218 (1996) (holding that

11   contractual choice of law provision did not apply to tort (fraudulent misrepresentation) claim).

12   The obvious implication of Georgia's approach is that Plaintiff's contract claims fall within

13   the choice-of-law provision, while its intentional misrepresentation claim does not.

14

15          Consequently, the Court must conduct a three-step "governmental interest" analysis to

16   determine whether substantive Georgia or California law governs the tort claim:

17

18          First, the court examines the substantive law of each jurisdiction to determine

19          whether the laws differ as applied to the relevant transaction.  Second, if the laws

20

21   [2]          Courts in the Ninth and Eleventh Circuits have noted that absent language in the choice-of-law provision stating
22   that "any and all claims arising out of the relationship between the parties shall be governed by [the relevant law]," the
     choice-of-law provision will only apply to those claims arising out of the parties' contractual duties.  *See, e.g.*, *Deep Sea*
23   *Fin., LLC v. British Marine Luxembourg, S.A.*, 2010 WL 3463591, at *2 (S.D. Ga. Sept. 1, 2010) (citing *Young*); *Pulte*
     *Home Corp. v. Am. Safety Indem. Co.*, 268 F. Supp. 3d 1091, 1098 (S.D. Cal. 2017) (citing, *inter alia*, *Deep Sea Fin., LLC*
24   and *Young*).  The MLPA states, in relevant part, "This Agreement shall be construed in accordance with the laws of the
     State of Georgia and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with
25   the substantive laws of the State of Georgia (without regard to conflicts of laws principles), except to the extent preempted
     by Federal law." (Hutchens Decl., Ex. A at 30.)  Thus, the MLPA does not contain language that would necessarily
26   encompass related tort claims within the ambit of the contractual choice-of-law provision.  These cases also describe an
     exception to this general distinction.  Where a plaintiff asserts a bad faith claim that arises out of contractual duties
27   contemplated by the agreement at issue, a contract's choice-of-law provision is applicable to that bad faith tort claim.  *See*
     *Pulte Home Corp.*, 268 F. Supp. 3d at 1098-99; *Deep Sea Fin., LLC*, 2010 WL 3463591, at *3.  This exception does not
28   apply here because Plaintiff asserts an intentional misrepresentation claim, not a bad faith claim, which is the type of tort
     Georgia recognizes as not being covered by a contractual choice-of-law provision.  *See Young*, 222 Ga. App. at 218.

17

do differ, the court must determine whether a "true conflict" exists in that each of the relevant jurisdictions has an interest in having its law applied. "If only one jurisdiction has a legitimate interest in the application of its rule of decision, there is a 'false conflict' and the law of the interested jurisdiction is applied." On the other hand, if more than one jurisdiction has a legitimate interest, "the court must move to the third stage of the analysis, which focuses on the 'comparative impairment' of the interested jurisdictions. At this stage, the court seeks to identify and apply the law of the state whose interest would be the more impaired if its law were not applied.

*Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000) (internal citations omitted). Generally, the preference is to apply California law, rather than choose the foreign law as a rule of decision. *Strassberg v. New England Mut. Life Ins. Co.*, 575 F.2d 1262, 1264 (9th Cir. 1978). And at the second step of the analysis, "the party seeking to dislodge the law of the forum[] bears the burden of establishing that the foreign jurisdiction has an interest, cognizable under California conflict-of-law principles, in the application of its law to the dispute at hand." *McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1424 (9th Cir. 1989).

In California, the elements of an intentional misrepresentation claim are (1) a misrepresentation; (2) knowledge of the falsity; (3) intent to induce reliance; (4) actual and justifiable reliance; and (5) resulting damage. *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). In Georgia, the elements needed to state an intentional misrepresentation claim are: "(a) that the representations were made by the defendant; (b) that they were knowingly and designedly false; (c) that they were made for the purpose and with the intent to deceive and defraud; (d) that they did deceive and defraud; (e) that they related to an existing or past fact; (f) that the party to whom the false statements were made did not know that they were false; and (g) that the plaintiff relied on their truth and suffered a loss." *D.A.D., Inc. v. Citizens & S. Bank of Tucker*, 227 Ga. 111, 117 (1971).

1    Regardless of which state's substantive law applies, the inquiry ends with the first step

2    of the governmental interest test.  Although the elements of intentional misrepresentation differ

3    under Georgia and California law, application of the economic loss doctrine of either state

4    would bar the claim.  Hence, the laws do not truly differ.  In both Georgia and California, the

5    economic loss rule generally provides that a contracting party who suffers purely economic

6    losses must seek its remedy in contract, and may not recover in tort.  *Gen. Elec. Co. v. Lowe's*

7    *Home Ctrs., Inc.*, 279 Ga. 77, 78 (2005) (Georgia); *UMG Recordings, Inc. v. Global Eagle*

8    *Entm't, Inc.*, 117 F. Supp. 3d 1092, 1103 (C.D. Cal. 2015) (California).  And neither State's

9    relevant exceptions to the economic loss rule apply here.[3]  As explained below, the Court

10   concludes that Claim Four is barred by operation of the economic loss rule under California

11   law.  Thus, because disposition of the issue of law presented here would be the same regardless

12   of which state's law is applied, there is no true conflict.  *EVGA Corp.*, 2020 WL 5028321, at

13   *4; *Costco Wholesale Corp. v. Liberty Mut. Ins. Co.*, 472 F. Supp. 2d 1183, 1200 (S.D. Cal.

14   2007) (explaining that for a governmental interest analysis, a "state's law is materially

15   different from California law if application of the other state's law leads to a different result"

16   (citation omitted)).  Accordingly, the Court must apply forum law.  *EVGA Corp.*, 2020 WL

17   5028321, at *4 (citing *Browne v. McDonnell Douglas Corp.*, 504 F. Supp. 514, 517 (N.D. Cal.

18   1980) (citing *Kasel v. Remington Arms Co.*, 24 Cal. App. 3d 711 (1972)) ("When the laws of

19

20

21   [3]    As relevant here, under Georgia law, the "misrepresentation exception" to the economic loss rule is defined as
     follows:  "[o]ne who supplies information during the course of his business, profession, employment, or in any transaction

22   in which he has a pecuniary interest has a duty of reasonable care and competence to parties who rely upon the information
     in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended

23   that it be so used.  This liability is limited to a foreseeable person or limited class of persons for whom the information was
     intended, either directly or indirectly."  *Robert & Co. Assocs. v. Rhodes-Haverty P'ship*, 250 Ga. 680, 681 (1983).

24   However, "before liability can attach under the misrepresentation exception[,] *false* information must be provided to a
     foreseeable person that the supplier of the information was manifestly aware would use the information and that foreseeable

25   person must rely upon the information to their detriment."  *Advanced Drainage Sys., Inc. v. Lowman*, 210 Ga. App. 731,
     734 (1993) (emphasis in original).  Plaintiff alleges that the misrepresentations at issue here were the implied promise in

26   the Conditional Approval forms Defendant issued to Plaintiff for each of the five loans at issue that signaled to Plaintiff
     that it would purchase the mortgages associated with the loans.  (Complaint ¶ 53.)  Even if these Conditional Approval

27   forms constituted representations, they did not contain false information.  Plaintiff alleges that throughout the parties'
     course of dealing, the same forms had been issued for all prior loans that Defendant purchased under the MPA.  (*Id.* at

28   ¶¶ 1, 13.)  Thus, Georgia's misrepresentation exception does not apply.
          The Court discusses California's exceptions at greater length in the following section.  *See infra* IV.B.

two interested jurisdictions do not differ significantly on an issue, the apparent conflict is a 'false conflict' and the court will apply the law of the forum.")).

### B. Claim Four is Barred Under California Law

California employs the economic loss rule as a means of "'prevent[ing] the law of contract and the law of tort from dissolving into one another.'" *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004). The rule requires a party to a contract to recover in contract "for purely economic loss due to disappointed expectations, unless [it] can demonstrate harm above and beyond a broken contractual promise." *Id.* Notably though, in *Robinson Helicopter*, the California Supreme Court held that the economic loss rule did not bar a plaintiff's "fraud and intentional misrepresentation claims because *they were independent* of [the defendant's alleged] breach of contract." *Id.* at 991 (emphasis added); *see also Erlich v. Menezes*, 21 Cal. 4th 543, 554 (1999) ("A breach of contract is tortious only when some independent duty arising from tort law is violated.") The court's reasoning relied on the fact that the plaintiff's intentional fraud-based and contract-based claims were dependent upon different alleged acts. *Robinson Helicopter*, 34 Cal. 4th at 990-91. Specifically, the defendant was alleged to have breached a contract by providing defective goods and also to have engaged in the separately tortious conduct of knowingly providing false certificates affirming that those goods were construed in conformance with plaintiff's specifications. *Id.* at 984-99, 990-91. The court emphasized that the "tortious conduct was separate from the breach [of contract] itself." *Id.* at 991. Likewise, a panel of the Ninth Circuit has explained that "[u]nder California law, tort damages may accompany contract claims when 'the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm.'" *Hannibal Pictures, Inc. v. Sonja Prods. LLC*, 432 F. App'x 700, 701 (9th Cir. 2011) (quoting *Erlich*, 21 Cal. 4th at 552); *see also EVGA Corp.*, 2020 WL 5028321, at *5 (analyzing similar issues).

//

1    Here, Plaintiff asserts an intentional misrepresentation claim, but the claim is *not*
2    independent of its breach of contract claim.  Both causes of action make identical allegations,
3    Plaintiff's intentional misrepresentation claim relies exclusively on the Conditional Approval
4    forms, and Plaintiff does not identify any extra-contractual representations.  (*See* Complaint
5    ¶¶ 34, 51-66.)  Thus, Defendant's failure to purchase the loans despite issuing the Conditional
6    Approval forms pursuant to the parties' agreement is a straightforward allegation of breach of
7    contract.  *See, e.g.*, *Alexsam Inc. v. Green Dot Corp.*, Case No. CV 15-5742-CAS, 2017 WL
8    2468769, at *4-*5 (C.D. Cal. June 5, 2017) (holding that intentional representation claim was
9    barred by economic loss rule because plaintiff did not plausibly allege harm above the broken
10   contractual promise).

11

12   Despite acknowledging that California recognizes the foregoing exception to the
13   economic loss rule (*see* Opposition at 13 (citing *Erlich*)), Plaintiff makes no attempt to argue
14   that the alleged misrepresentations implied by the issuance of the Conditional Approval forms
15   were independent of the parties' contract.  Rather, Plaintiff argues that the economic loss rule
16   does not apply here to bar its tort claim because the rule does not apply to fraudulent
17   inducement claims.  (*Id.* at 13-15.)  While California recognizes fraudulent inducement as an
18   exception to the economic loss rule, *see Lazar*, 12 Cal. 4th at 645, Plaintiff does not plead that
19   it was induced to enter the MLPA by fraud.  Rather, it argues that the forms Defendant issued
20   several months after the MLPA was entered into were somehow fraudulent.  Thus, Plaintiff's
21   argument for not applying the economic loss rule is unavailing.

22

23   Because Plaintiff has failed to identify tortious conduct distinct from that which
24   constituted a breach of contract, or a duty arising completely independent of the underlying
25   agreement, its intentional misrepresentation claim does not fall within the identified exception
26   to the economic loss rule.  That Plaintiff's contract and tort claims stem from the exact same
27   factual predicate bolsters this conclusion.  There is no appreciable difference between Claims
28   One and Four.  Further, identical redress is sought pursuant to each claim – damages in the

amount of $8,440,960 (the agreed purchase price of the five mortgages), less any amounts Plaintiff could recover through its efforts to mitigate damages by selling the mortgages at the prevailing market rates.  (Complaint ¶ 56.)  As such, the allegations of the Complaint and the terms of the parties' agreement make plain that Plaintiff's intentional misrepresentation claim is the breach of contract claim re-cast as one in tort.

Accordingly, Claim Four must be dismissed under California law, and Defendant's Motion is GRANTED as to this claim.

### C.  Plaintiff's Request for Punitive Damages Must Be Dismissed

In this Circuit, a Rule 12(b)(6) motion is the appropriate procedural vehicle to seek dismissal of a request for punitive damages.  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973-74 (9th Cir. 2010).  In both California and Georgia, punitive damages are not an available remedy for breach of contract.  *See* GA. CODE ANN. § 13-6-10; CAL. CIV. CODE § 3294(a) (stating that punitive damages are available "[i]n an action for the breach of an obligation not arising from contract"); *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 516 (1994) ("In the absence of an independent tort, punitive damages may not be awarded for breach of contract [in California] even where the defendant's conduct in breaching the contract was willful, fraudulent, or malicious.")  Tortious liability for intentional misrepresentation would, however, support a prayer for punitive damages.  *See Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1241 (1995); *see also First Citizens Bank & Trust Co. v. Taipei Invs. LLC*, 2020 WL 2095793, at *4 (C.D. Cal. Feb. 18, 2020) (citing CAL. CIV. CODE § 3294(a) for proposition that "intentional misrepresentation is a tort under which [a party] may recover punitive damages").

As discussed, Plaintiff's intentional misrepresentation claim must be dismissed.  Thus, Plaintiff's demand for punitive damages must likewise be dismissed because the only claims

surviving Defendant's Motion are grounded in contract.  Further, even if Plaintiff alleges that Defendant's breach was malicious, oppressive, fraudulent, or otherwise in bad faith (*see* Complaint ¶ 58), the intent behind the breach is immaterial; punitive damages are not permitted even where a breach of contract is "willful, fraudulent, or malicious."  *Applied Equip. Corp.*, 7 Cal. 4th at 516.

Accordingly, Defendant's request to strike Plaintiff's claim for punitive damages is GRANTED.  Leave to amend is DENIED as futile because Plaintiff's breach of contract and intentional misrepresentation claims arise from the same alleged failure to act under the MLPA, and, for the reasons described above, Plaintiff cannot assert an intentional misrepresentation based in contract.

**V.      Claim Five (Negligent Misrepresentation)**

The parties agree that Claim should be dismissed because the relief available is duplicative of that available in contract. (Motion at 18; Opposition at 19.)  Accordingly, the Motion is GRANTED in part as to Claim Five.

**CONCLUSION**

For the reasons stated above, IT IS ORDERED that the Motion to Dismiss is GRANTED in part and DENIED in part, as follows.  The Court hereby DISMISSES Claim Two, Claim Four, and Claim Five.  Additionally, the Court hereby DISMISSES Plaintiff's prayer for punitive damages.

//
//
//
//

1         Defendant is ordered to file an Answer to Claim One and Claim Three in the Complaint

2    **within 14 days of this Order**.

3

4    DATED: September 3, 2020

5

6                      KAREN L. STEVENSON

7                UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28